**CITY OF GROTON et al.**

v.

**CONNECTICUT LIGHT & POWER CO. et al.**

**Civ. No. 15609.**

United States District Court,
D. Connecticut.

Aug. 27, 1980.

---

Charles F. Wheatley, Jr., Philip B. Malter and James Howard, Wheatley & Wollesen, Washington, D. C., for all plaintiffs.

John J. Ryan and John A. Milici, Norwalk, Conn., for plaintiffs, Norwalk II and III.

Palmer S. McGee, Jr., Albert Zakarian, April Haskell, Dean M. Cordiano, Day, Berry & Howard, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

In February of 1973, several Connecticut municipalities filed a complaint against the

investor–owned utilities that supplied them with electric power, alleging a variety of antitrust violations. Now, over seven years later and after a seven–week trial, the time for a ruling on the merits is at hand.

## I.

### The Parties

When the suit was begun, there were six plaintiffs, all towns in Connecticut. Each of these towns possessed its own electrical distribution network, and each purchased power at wholesale from the defendant, Connecticut Light & Power Co. ("CL&P"). The state granted each town a charter which provided it with the exclusive right to sell power at retail to customers within its geographic limits. Three of the municipalities, the City of Norwich ("Norwich"), the Town of Wallingford ("Wallingford"), and the Second Taxing District of Norwalk ("Norwalk II"), also had a limited capacity for generation which, while inadequate to supply all of their towns' residential and commercial needs, was capable of supplementing their wholesale purchases of bulk power.[1]

The defendants include Northeast Utilities, Inc. ("NU"), a holding company incorporated in Massachusetts, and its wholly-owned subsidiaries. In 1966 CL&P, a Connecticut corporation, joined with Hartford Electric Light Company ("HELCO"), another Connecticut utility corporation, and Western Massachusetts Electric Company ("Western Mass"), a Massachusetts utility, to form NU. NU now owns all of the common stock in CL&P, HELCO and Western Mass. NU also owns all of the stock in Northeast Utilities Service Company ("Service Co."), a service company for the entire system which provides, among other things, financial planning and accounting services to the subsidiary companies. Although all of these companies, except Western Mass, have been named as defendants, the evidence at trial established that the plaintiffs' dealings and transactions were solely with CL&P.

Both CL&P and HELCO provide retail service in Connecticut pursuant to exclusive state franchises. The franchise areas of municipalities, CL&P, and HELCO contain no overlapping areas. All of the municipals' franchise areas except for that of Wallingford are totally surrounded by the franchise areas of CL&P and HELCO.

## II.

A. *History of the Contractual Relationships Between the Plaintiffs and CL&P*

In 1948, CL&P was supplying all of the municipalities with electrical power pursuant to contracts with each of them. The City of Groton ("Groton"), the Third Taxing District of Norwalk ("Norwalk III"), the Borough of Jewett City ("Jewett City"), and Wallingford were total–requirements customers, *i. e.*, they purchased all of their power from CL&P. In Norwich and Norwalk II, CL&P supplemented the power the towns were able to generate on their own.

During the 15–year period between 1948 and 1963, these supply contract arrangements were changed only slightly. For a brief period following World War II, both Norwich and Norwalk II were able to become totally self–sufficient. Similarly, in the early 1950's, by constructing the Pierce Generating Station, Wallingford was able to change its status from a total–requirements customer to one able to generate all the energy it needed. In all three of the generating communities, however, the growth of demand for electricity soon outstripped the capacity for self–generation and all three looked to CL&P to supply their supplemental needs. As of 1962, CL&P was supplying all the needs of Groton, Norwalk III, and Jewett City, and all the supplementary requirements of Wallingford, Norwich, and Norwalk II.

---

1. Shortly before trial actually commenced, three of the six plaintiffs, City of Groton, Borough of Jewett City, and Norwich, reached a settlement agreement with the defendants. The other three plaintiffs, Wallingford, Norwalk II and the Third Taxing District of Norwalk have pressed the suit to completion.

In 1962, CL&P began to negotiate with all six towns for a new contract. At this time, at least some of the municipal systems were again considering the installation of new equipment as a step toward total self–generation. The evidence at trial established that the negotiations over the new contract were intensive and thorough. Both sides had the benefit of counsel and consultants. Both the municipalities and CL&P conceded some points and provided some inducements in order to obtain agreement on others.

In 1963–64, new agreements ("1963 contracts") were finally reached with each of the towns. These contracts were ten–year, full–requirement contracts. The charge to the municipalities for the supply of electricity was to be based on two components. A "demand" charge was leveled to recoup fixed costs, and an "energy" charge was computed to recover variable costs. This form of rate was not uncommon in the industry at the time and, in fact, it was the same rate structure as had been used in prior CL&P–municipal contracts.[2] The evidence suggests that initially both the municipalities and CL&P were fairly satisfied with the terms and rates embodied in the contract.

This satisfaction was short–lived, however. In 1965 and 1966, the municipalities began to agitate for a modification of the contract that would reduce their rates. Acting together, they hired a new consultant, Mr. Alexander Wiskup, who, after he arrived in 1965, performed what he considered a "quickie cost of service analysis." His figures led him to believe that a substantial reduction in the rates charged to the towns was warranted. CL&P countered by offering a smaller rate adjustment. Unable to reach a compromise, the municipalities then filed a complaint before

the Federal Power Commission ("FPC"). In June of 1967, after further negotiations, the FPC secured the parties' agreement to a modification ("1967 contract"), which provided for an annual billing reduction of approximately $260,000. The modification also changed several other provisions in the 1963 contracts. It reduced the previously required three–years advance notice of cancellation to one year and clarified the municipalities' right to install new generating equipment without being in breach of the contract. The 1967 contract also provided for the establishment of a Joint Advisory and Review Committee composed of representatives of the municipalities and the private utilities. This committee was established to discuss various additional modifications desired by the municipalities.

As part of the negotiations leading up to the 1967 contracts, CL&P offered to replace the 1963 contracts with a new rate form. On October 11, 1967, a meeting was held with CL&P officials and representatives of the municipalities at Haddam Neck, Connecticut. There the company unveiled its new proposal, referred to at trial as the "Haddam Neck" proposal, which included two separate contracts. Under the terms of the first, each municipality was to pay CL&P for its total system demand. That is, each municipality would pay CL&P as if it had purchased all of its electricity from CL&P even if it had some capacity for self–generation. Then, in the second contract, CL&P would contract to buy all of the generating capacity which each of the municipalities owned. CL&P would have the right to direct when each of the municipals' generating systems would have to operate. The plaintiffs deemed this arrangement to be unsatisfactory and turned down the offer.

2.  All of the contracts and tariffs governing the relations between CL&P and the municipals were filed for regulatory review. In 1963, when the 1963 contracts were first completed, the Federal Power Commission ("FPC") did not claim to have jurisdiction over wholesale rates charged by utilities. However, in 1964, the Supreme Court ruled that they had such juris-

diction. *FPC v. So. Calif. Edison Co.,* 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964). Thereafter, in late 1964, the utility companies submitted the contracts for review. Every modification to their terms and all the subsequent tariffs were carefully reviewed by the appropriate regulatory commission.

In 1968, the parties entered into yet another contract ("1968 contract"). Under the terms of the 1963 contracts, the municipalities had been given a certain credit for the generating capacity that they had available. In order to earn the credit, they had to operate their generating units for two hours a day during three months of the year. For the remaining nine months of the year the municipalities were allowed to shut down their generators completely. In the 1968 contract CL&P agreed to purchase this "excess" capacity. That is, it purchased the right to call on the municipalities during these nine months to operate their units for the benefit of CL&P. While the 1968 agreement was in effect, CL&P only rarely availed itself of this prerogative.

Acting together in the context of the Joint Advisory and Review Committee, the municipalities continued to complain both about the level and the structure of the rates in the 1963 agreements which had already been modified once as a result of the 1966–67 FPC proceedings. In late 1969 and early 1970,[3] these complaints prompted three proposals referred to at trial as Alternatives 1, 2, and 3. These proposals were all drafted by CL&P, and the municipals offered counter–proposals. Again, the parties failed to reach any agreement. While the provisions of these rates are not particularly relevant to this proceeding, it is worth noting that all of the Alternatives were based on the same demand/energy rate structure contained in the 1963 agreements.

The next significant interactions between these parties came with the circulation of Offers of Power by the Maine Yankee and Vermont Yankee Nuclear Power Corporations in August 1970. CL&P and other major investor–owned utilities had decided to construct two large nuclear plants in Maine and Vermont. By order of the Securities and Exchange Commission, these companies were obligated to offer other New England utility systems an opportunity to participate in the nuclear projects. Participation was made possible through "entitlements." Purchase of an entitlement enabled a utility system to receive a certain percentage of all the power generated by the plant for 30 years. When the power plant was operating, the participant would receive its percentage share. When the unit was "down," i. e., not operating, the participant would receive nothing.

The municipalities did not accept these offers either.[4] In letters of October 22 and 23, 1970, Mr. William M. Clinton, on behalf of all the municipalities, declined the Maine and Vermont Yankee offers, claiming that the municipalities had inadequate information on which to base a decision to participate. Nonetheless, his letter expressed appreciation to CL&P and NU for making available the limited amount of technical data relating to these offers which they had in their files.

Because the parties were unable to agree on changes to the 1963 contracts except as they were modified by the 1967 and 1968 agreements, they continued to govern the applicable rates between CL&P and the municipalities. By the late 1960's and early 1970's, the cost of· supplying energy had started to rise for the first time in several decades. The contracts established in 1963 had not anticipated any such rise, and

---

**3.** The appropriate statute of limitations cut off date applicable to this action is February 13, 1969, four years prior to the commencement of the action. 15 U.S.C. § 15b (1976). Evidence of conduct prior to that date has been recounted here and was offered at trial for three reasons. First, it was offered as background to make the plaintiffs' claims more understandable. Second, the prior interactions between the parties was put in evidence to support the claim that the defendants acted with an intent to monopolize the market in their post–February 1969 actions. Finally, the history prior to the cut–off date is relevant in that anti–competitive injury suffered after the cut ·off date which was caused by anti--competitive conduct prior to that date is compensable under the antitrust laws. See Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 96 (2d Cir. 1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

**4.** Evidence was introduced at trial suggesting that at least one of the plaintiffs, Wallingford, was prohibited by its charter from entering into a contract with a term in excess of ten years:

CL&P began to realize losses in its sales of electricity to the plaintiffs. When it became apparent that the municipalities would not agree to the terms of Alternatives 1, 2, or 3, CL&P decided to exercise its right to cancel the contracts unilaterally. In February 1971 the requisite one–year notice was given. Because CL&P's rates had become so favorable to them, the municipalities challenged the cancellation notice before the FPC. The FPC, however, upheld CL&P's action and the 1963 contracts were terminated in 1972.

Shortly before the 1963 contracts expired, however, one additional round of negotiations took place. CL&P had planned to build a large pump–storage electrical plant at Northfield, Massachusetts. As it was explained at trial, a pump–storage plant is composed of essentially two pools of water at different evaluations. At night, when the demand on CL&P's conventional power units is low, the units are used to pump the water from the lower pool to the higher one. Then, during the hours of peak demand on the following day, the water in the upper pool is released through turbines thereby generating additional energy. By utilizing a pump–storage plant, CL&P was able to save the capital costs necessary to construct the more expensive conventional units which would otherwise be needed to insure adequate capacity for peak periods of demand.

In late 1972, primarily as a bargaining chip for its "nuisance value," the municipalities filed a complaint with the FPC insisting that they be offered an opportunity to participate in the Northfield project. The FPC ruled in their favor, but only Mr. John Gallagher, on behalf of Wallingford, indicated even conditional interest. After CL&P agreed to allow Wallingford to file a conditional acceptance, Mr. Gallagher never responded. None of the plaintiff–municipalities has ever purchased any entitlements in the Northfield pump–storage unit.

In 1972, the 1963 contracts were terminated and replaced by a tariff. This tariff, known as the R1 rate, was never accepted or agreed to by the plaintiffs. Pursuant to the applicable statutes and regulations,[5] CL&P simply filed the rate with the FPC[6] and, after a brief period of suspension, it automatically took effect, subject to a later challenge and possible refund. The R1 rate was in effect from January 1973 until September 1974. By the time that the FPC was able to consider plaintiffs' objections to its terms, it already had been replaced by the filing of a new R2 rate.

While the R1 rate will be discussed later in this opinion, a brief description of the rate may be useful at this time. The R1 rate utilized a new type of rate structure which established charges based on stratified costs rather than on overall average costs.

Under the 1963 contracts, demand charges levied on a per kilowatt basis had been assessed primarily to cover the capital costs of the generating units necessary to provide the municipalities with the capacity they needed throughout the year. In calculating this charge, the fixed costs associated with all of CL&P's generating equipment had been divided by the total kilowatts of demand, and the resulting average cost per kilowatt was charged for each kilowatt of demand without reference to which plant generated the particular energy delivered. Thus, if CL&P had one plant with demand costs of $2/kw, one with costs of $3/kw, and another with $4/kw, it would charge the average price ($3/kw) for each kilowatt without regard to which plant actually generated the energy in question.

Under the stratified rates, however, CL&P did away with this average–cost pricing. In terms of the grossly simplified example above, a stratified rate would result in a charge to a customer of $2/kw if

**5.** See 16 U.S.C. § 824d (1976); 18 C.F.R. § 35.0 et seq.

**6.** The R1 rate was filed with the FPC but some later filings were made before the Federal Energy Regulatory Commission ("FERC"), which superseded the FPC on October 1, 1977. 42 U.S.C. § 7172(a) (Sup. I 1977). FERC's regulatory role supplants that of the now defunct FPC.

the energy purchased was from the $2/kw unit, $3/kw if it was from the $3/kw unit, and $4/kw if it was from the $4/kw unit.[7] The economic experts at the trial referred to this as an "unbundling of costs."

In addition to this change in the rate structure, the R1 rate differed from the 1963 contracts in that it was not a total–requirements contract. In Rider A, an appendix to the main body of the R1 rate, CL&P provided for

"situations when a wholesale customer elected to participate in [the New England Power Pool ("NEPOOL")[8]] and to subject its own generation to NEFOOL dispatch, or to participate in a jointly owned generating unit either as an owner or a unit contract purchaser.

"Under Rider A, CL&P would supply service up to a specified contract demand, *on a partial–requirements basis*, when a customer became a NEPOOL participant and took entitlements from sources outside CL&P's system."

The Connecticut Light and Power Company, F.P.C. Docket No. E–7743 (July 29, 1974), at 23 (emphasis added).

In September 1974 the R1 rate was voluntarily withdrawn by CL&P and superseded by the R2 rate. The R2 rate was also a stratified rate, but it contained no equivalent to the Rider A found in R1. At trial, CL&P explained that Rider A was omitted from the R2 filing because none of the municipalities had expressed any interest in making use of its provisions. When the FPC later got around to ruling on the R1 rate it, too, noted the lack of interest in Rider A and ordered it stricken from the tariff as "premature." The R2 rate did contain, however, a proviso which expressed the company's willingness to negotiate a

partial–requirements rate any time a municipal customer expressed an interest in purchasing power from outside sources.

The R2 rate, like the R1 rate, was never accepted by the municipalities and was challenged before the FPC. Like the challenge to the R1 rate, the challenge to the R2 rate was not resolved until after the R2 rate was superseded by a subsequent rate filing. This did not moot out the challenges to R1 and R2, however, which resulted in some substantial refunds to the municipalities.

On March 2, 1976, the R3 rate became effective, and in February 1979 it was replaced by the R4 rate. Both the R3 and the R4 rates continued the same basic concept that had been established in the R2 rate. The levels of charges were increased to reflect CL&P's rising costs, but the structure remained essentially intact. The R4 rate is still in effect today.

### B. *Development of NEPOOL*

The interactions between the parties which are chronicled above took place against the backdrop of more extensive negotiations between utilities in New England. In order to fully understand and evaluate the plaintiffs' claims, it is necessary to outline briefly the genesis and purpose of the New England Power Pool ("NEPOOL").

In 1965, New York and New England suffered a major power blackout. As a result of concern generated by this shortage and as a result of increasing pressure to achieve economies of scale, some of the major New England utility companies be-

---

**7.** At trial, it was shown that the power supplied to the municipals could be categorized into different types. For a relatively few hours during each year the demand for electricity soared substantially above the more ordinary power requirements. These hours were referred to as the "peak" period. During this peak period the power supplied over and above the usual amount of power supplied constituted "peak" power. Peak power, unlike other power (base–intermediate power), is provided from peak

unit generators which generally have smaller fixed capital costs that do the base–intermediate units. Under the stratified rates, the demand charge for a unit of peak power was much less than the demand charge associated with base–intermediate power.

**8.** The significance and development of NEPOOL is considered at length, *infra,* at 1047 *et seq.*

gan to explore the possibility of pooling their resources to achieve greater reliability and greater economy in the generation of power. Early drafts of a pooling agreement were circulated to the various New England utilities in the late 1960's, but these proposals were generally unacceptable to them.

Thereafter, on June 19, 1969, a large meeting open to all utility companies in New England and to various regulatory bodies was held in Northfield, Massachusetts. Representatives from NU and from the municipalities were present. At this meeting a working committee was established to develop a more acceptable pooling proposal. The working committee met regularly for the next year, and its meetings were open. Although membership was apparently fluid, both NU and the Connecticut municipalities were usually represented at these meetings. Various federal and state regulatory officials were also in attendance. .

In the spring of 1970, the working committee produced and circulated two documents. The first was entitled "Interim NEPEX Power Exchange Agreement" ("NEPEX"), and it established an interim pooling arrangement eventually to be superseded by the NEPOOL agreement. The second document was a "letter of intent" expressing, on behalf of the signatories, an intent to join in the NEPOOL agreement when such an agreement was finally prepared. Both of these documents were endorsed on behalf of NU and CL&P, and the letter of intent was endorsed on behalf of all of the municipalities. General widespread support for NEPOOL was evidenced by the large proportion of New England utility systems which signed the letter of intent. NEPEX went into effect in June of 1970 and continued to govern the affairs of its participants until September 1, 1971 when NEPOOL became effective.

NEPEX and NEPOOL have no corporate status, nor have they ever owned any generating or transmitting equipment. NE-

PEX and NEPOOL are merely agreements designed to increase protection against blackouts and to save costs. To these ends, three separate policies have been instituted. First, all generation has been placed in the control of a central dispatcher whose job it is to "bring on line" the cheapest available sources of energy in New England and to bring enough of them "on line" to cover all of the demand for power in New England. His decisions are to be made without reference to ownership. This was referred to at trial as "economy interchange."

The second major thrust of NEPOOL is to provide for pooled resources to construct large, efficient units capable of achieving significant economies of scale. The Maine and Vermont Yankee Nuclear Power offerings, while predating NEPOOL, exemplify this form of joint effort. Under NEPOOL, a participant in one of these joint projects is entitled to have any energy generated by the plant transmitted to it over the transmission lines of other NEPOOL participants. The rate for such transmission, or "wheeling" as it is often referred to, does not depend on the distance between the participant's distribution system and the generator. This is referred to as a "postage stamp" rate because unlike traditional charges for wheeling it is not distance–sensitive.

Finally, by interconnecting the utility systems greater reliability is attained. A unit ready to "go on line" in Maine, for example, can serve as a reserve for a system operating in Rhode Island. Thus, interconnection also substantially lessens the chances of future power blackouts.

During the planning stages for NEPOOL in the late 1960's and early 1970's, the plaintiff–municipalities expressed great interest in establishing and participating in NEPOOL. As noted, they signed a letter of intent indicating a willingness to participate in NEPOOL as late as May 1970. However, when the NEPOOL agreement was finally prepared in September 1971, the municipalities refused to join.

The municipalities point to various "oppressive" and "discriminatory" provisions in both the NEPOOL agreement and in Rider A to the R1 rate.[9] It appears quite unlikely, however, that these provisions explain why the Connecticut municipalities did not join NEPOOL. An examination of the provisions of NEPOOL reveals that they are neither onerous nor unreasonable. NEPOOL now includes nearly 50 other municipal systems which find it an acceptable arrangement.

The legality of the NEPOOL agreement has already been thoroughly considered. In November 1975, an Administrative Law Judge considered "[w]hether the NEPOOL agreement is contrary to anti-trust law and policy." He decided that it was not. With respect to the provisions which the NEPOOL agreement now contains,[10] the FPC affirmed the Administrative Law Judge's decision. On appeal, the ruling of the FPC was affirmed by the United States Court of Appeals for the District of Columbia. *Municipalities of Groton v. Federal Energy Regulatory Commission*, 587 F.2d 1296 (D.C. Cir.1978).

Rather than any restraints allegedly imposed by the provisions of NEPOOL, the underlying reason for the plaintiffs' reversal of their intention to participate may be found in the minutes of a meeting of the Connecticut Municipal Electric and Gas Association held on June 1, 1973 in Guilford, Connecticut. The final determination on whether the plaintiffs would participate in NEPOOL was to be made at the meeting. The Secretary of the group recorded the following:

> "Regarding NEPOOL, Mr. Wheatley said that signing the NEPOOL Agreement would be detrimental to our anti-trust case and it was agreed that the Connecticut Municipals would not sign the Agreement."

## III.

### Preliminary Analysis

While the plaintiffs were invited to file a brief setting forth specific claims, their efforts in response fall short of what might have been hoped for. Throughout this action they have persisted in what might charitably be considered the "shotgun" approach to antitrust litigation: they have challenged everything and now hope to hit something. Rather than discussing each of the myriad claims which the plaintiffs advance, it will be useful roughly to divide these claims into two groups.

First, the vast bulk of the plaintiffs' claims are addressed to the terms and conditions set forth in the contracts and rates themselves. With respect to the 1963 contracts and R tariffs, the plaintiffs claim that the ratchet and reserve requirements, the territorial restrictions on resale, and the methods for calculating the rates all constituted anticompetitive restraints. Unifying all of these foregoing separate claims is the nature of the defendants' alleged anticompetitive behavior. In each of these claims the defendants are alleged to have engaged in anticompetitive conduct by agreeing to the terms in a contract or by filing a tariff containing certain terms. The contracts or tariffs in which these defendants have participated have all been promulgated pursuant to the Federal Power Act, 16 U.S.C. §§ 791a *et seq.*, and reviewed by the relevant Commissions.

In their second group of claims, plaintiffs have alleged that the defendants engaged in anticompetitive behavior beyond the mere promulgation of the rates and conditions of service. In particular the plaintiffs complain (1) that CL&P refused to wheel power to or from outside sources over its transmission lines, (2) that CL&P joined a NEPOOL agreement containing anticompetitive terms, (3) that CL&P delayed in

---

9. Had the plaintiffs joined NEPOOL and still received some electricity from CL&P while the R1 rate was in effect, they would have taken the electricity subject to Rider A.

10. The FPC did rule that two provisions, the 30 percent term and the "capability responsibility" term, discriminated against smaller utilities. These two provisions are described in a later portion of this opinion and the effect of the FPC ruling is also considered. *Infra*, at 1053–54.

offering a partial–requirements rate which would have permitted the plaintiffs an opportunity to supplement CL&P power with power from other utilities, and (4) that CL&P placed the municipalities in a price squeeze by charging more for its sale of power to the plaintiffs at wholesale than it did for the sale of power at retail to its own industrial customers.

I consider first the claims based on the rates and conditions of service.

### A. The Role of Regulatory Agencies

■ This case raises the question of how the policy against restraint of trade exercised by monopoly power as expressed in the Sherman Act, 15 U.S.C. § 1 *et seq.* (1976), should be accommodated to the public utility business of the defendants, who are franchised monopolies by public grant. As public utilities, they were long subject to detailed and continuous regulation by the FPC under the Federal Power Act, 16 U.S.C. § 824 (1976), and are now comprehensively regulated by the FERC, *see* note 6 *supra.* Of course, it is well settled that the mere existence of a regulatory body will not provide the defendants a blanket immunity against all antitrust claims. *Otter Tail Power Company v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *City of Newark v. Delmarva Power & Light Co.,* 467 F.Supp. 763 (D.Del.1979). Nonetheless, the remedial goal of both the federal antitrust and the regulatory energy laws is to protect consumers against being subjected to unfair charges for goods or services which monopoly power makes possible.

While there is a potential for an evil use of monopoly power, it is not the mere existence of that potential but rather its illegal exercise which the Sherman Act forbids. Thus, where eight railroads and twelve individuals conspired to maintain unreasonably high freight rates, Justice Brandeis, writing for a unanimous Court, held that even if the rates challenged by a shipper were the product of a conspiracy, no action would lie. The Court reasoned that the rate "is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti–trust Act. What rates are legal is determined by the Act to Regulate Commerce." *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 162, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922). The opinion continued:

> "Section 7 of the Anti–trust Act, [current version at 15 U.S.C. § 15 (1976)] gives a right of action to one who has been 'injured in his business or property.' Injury implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier."

*Id.* at 163, 43 S.Ct. at 49.

■ Similarly, the rates made legal under the Federal Power Act are the legal rates as between the supplier, CL&P, and the buyers, the municipalities. The municipalities had no legal right to receive any rate other than the rate on file with the Commission. Since they received the legal rate, they, like the carrier in *Keogh,* were not injured in their business or property. Absent such an injury they have no right of action for relief.[11]

---

11. Reliance on the *Keogh* doctrine is supported by a more recent decision of the Court of Appeals for the Fifth Circuit. In *Gas Light Co. of Columbus v. Georgia Power Company,* 440 F.2d 1135 (5th Cir. 1971), *cert. denied,* 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972), the court ruled that where a regulatory body exercised complete control over rates and practices of a private utility, a court would be precluded from granting antitrust relief based on a challenge to the rates. While the regulatory body involved in *Gas Light* was a state rather than a federal body, this is a distinction without a difference. The court in *Gas Light* reasoned:

> "Each of these acts and practices are rate schedules and each has been considered by the Georgia Public Service Commission in an adversary proceeding. Each is effective by order of the Commission.... [Two of the provisions complained of] were left in effect but Georgia Power was ordered to revise [another term] in a manner prescribed by the

The fact that the FPC later ordered certain aspects of the rates rejected and excluded does not mean that CL&P was guilty of illegal conduct in applying those provisions before they were rejected. Until rejected by the Commission, CL&P was permitted and, in fact, required to charge under the provisions of the rates it had filed with the Commission.[12]

■ Moreover, even if the plaintiffs could be said to have a right of action notwithstanding the *Keogh* doctrine, I find that with respect to the terms of the 1963 contracts and R tariffs they still have not proved an antitrust violation. The fact that a utility may put a rate into effect by filing it with the Commission does not ipso facto establish that the rate is reasonable. On the other hand, the submission of the rate to the Commission for its scrutiny as to reasonableness goes a long way toward negating an inference that its purpose was to drive the plaintiffs out of business. *See Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 354 (5th Cir. 1980).

The particular aspects of the rates which the plaintiffs challenged in this case, both before the Commission and this court, were not so devoid of reasonableness as to justify the inference that they were intended to enhance CL&P's alleged monopoly power. *City of Mishawaka v. American Electric Power Co., Inc.*, 616 F.2d 976, 985 (7th Cir. 1980).

Nor do I infer from any of the other evidence in the case that the defendants acted with any intent to monopolize. Their rates and provisions were reasonable, and the legitimate business justifications they offered to explain their actions are entirely credible. Since intent to monopolize must be shown to establish their Sherman Act claims against these regulated utilities, *Mishawaka, supra* at 985, plaintiffs have failed to establish this element of their proof.[13] Furthermore, these provisions do not constitute unreasonable restraints on trade nor does their inclusion amount to conduct in violation of section 2 of the Sherman Act. Of course I do not sit to review the action of the Commission, but,

Commission. Moreover, the Commission retains jurisdiction with respect to each of the rate schedules for entering such other and further orders as the Commission may deem proper."
*Id.* at 1137–38. The court further explained: "[T]he Commission here gave lengthy consideration to each of the practices and rates under attack, and after full adversary hearings ordered them into effect, some with major modifications. . . . Though the rates and practices originated with the regulated utility, Georgia Power, the facts make it plain that they emerged from the Commission as products of the Commission. They are thus immune from the operation of the antitrust laws under the [*Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)] exemption."
*Id.* at 1140.

12. 18 C.F.R. § 35.1(e) provides:
"No public utility shall, directly or indirectly, demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service subject to the jurisdiction of the Commission, or impose any classification, practice, rule, regulation or contract with respect thereto, which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown."

13. In the usual case of monopolization, the intent required under section 2 need not be a specific intent to monopolize. *United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948). However, in cases involving regulated utilities, general anticompetitive intent ought not suffice to show a violation of section 2. It has been persuasively argued that *specific* intent to impair plaintiffs' competitive ability and to preserve an existing monopoly should be required. *City of Mishawaka v. American Electric Power Co., Inc.*, 616 F.2d 976 (7th Cir. 1980).
"In *Sargent Welch*, we relied on *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) . . . . In *Griffith*, it was held that it is not always necessary to find specific intent lest it cripple the Sherman Act. *Id.* at 105, 68 S.Ct. at 944. In the particular circumstances, however, of a regulated utility struggling with dual regulation, bearing in mind that the utility is entitled to recover its cost of service and to provide its investors with a reasonable rate of return, we believe that something more than general intent should be required to establish a Sherman Act violation."
*Id.* at 985. *Cf. Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 354 (5th Cir. 1980) ("Monopolization cases involving such regulated industries are special in nature and require close scrutiny.").

even if I were to consider and review these rates de novo, I would also conclude, despite the spirited contentions of the plaintiffs to the contrary, that the rates, including every condition or qualification of them, and the factors upon which they were based, do not support a right of action under the antitrust laws.

## B. Conduct Not Relating to Rates

■■■ Notwithstanding the above discussion, the claims presented by the plaintiffs which are not based on provisions in the rates still remain for the court's analysis. As indicated above these include the alleged refusal to wheel power, the alleged anticompetitive terms of NEPOOL, the alleged refusal to offer a partial–requirements rate, and the price squeeze allegations. Plaintiffs raise these claims under section 1 and section 2 of the Sherman Act and under section 2(a) of the Clayton Act.[14] As set out below, the evidence presented clearly did not establish exclusionary conduct or conduct in restraint of trade as to any of these claims.

14. The elements which plaintiffs need prove to prevail on these claims are set out below.

*Section 1 of the Sherman Act*

"To sustain this claim, plaintiffs must prove by a fair preponderance of the evidence two essential elements: first, that the defendants entered into a 'contract, combination ... or conspiracy,' and second, that such contract, combination or conspiracy was in restraint of trade or commerce among several States.' " *DuPont Glore Forgan, Inc. v. American Telephone and Telegraph Co.*, 437 F.Supp. 1104, 1111 (S.D.N.Y.1977), *aff'd*, 578 F.2d 1367, *cert. denied*, 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978) (footnote omitted); *Almeda Mall, Inc. v. Houston Lighting and Power Co.*, 615 F.2d 343, 350 (5th Cir. 1980).

When and under what circumstances wholly owned subsidiaries can conspire with each other is a difficult question on which the law is not settled. It is also a question which need not be resolved here. For the purpose of this ruling, the court can assume *arguendo* that the plaintiffs have established the first element of their section 1 claim by establishing a sufficient intracorporate conspiracy. The second element—action in restraint of trade—will be discussed in the context of the specific claims which the plaintiffs advance.

*Section 2 of the Sherman Act: Monopolization*

In order to establish a "monopolization" claim, plaintiffs first must show that the defendants possessed monopoly power, *Berkey Photo, supra*, 603 F.2d at 272. Then they must establish either "the willful acquisition of that power" or the willful "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Berkey Photo, supra*, at 274. For the purpose of this ruling, it will again be sufficient to assume *arguendo* that CL&P and NU had monopoly power. The plaintiffs' proof on the other element of the offense, proof of impermissible monopoly conduct (referred to in this case as "exclusionary" conduct) will be discussed on a claim–by–claim basis below.

*Section 2(a) of the Clayton Act as amended by the Robinson–Patman Act*

Plaintiffs' complaint alleged that the "price squeeze," which was set up when CL&P allegedly charged lower rates to industries at retail than it charged to the municipalities at wholesale, constituted a violation of section 2(a) of the Clayton Act, 15 U.S.C. § 13(a). In their trial brief and post–trial brief, the plaintiffs now apparently have abandoned this claim.

It appears to be a claim properly abandoned. Among other problems, the plaintiffs cannot show discrimination in the price of any *commodity*. Electricity is not a commodity for purposes of the Act. *City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763, 774 (D.Del. 1979). Moreover, if the municipalities claim to be disfavored wholesale purchasers, it is not at all clear who the favored competing wholesale purchasers are. It cannot be the industries and commercial customers for they clearly do not compete with the municipalities. *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1170–71 (8th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). Arguably the plaintiffs want the court to find the division of CL&P responsible for wholesale sales to be a favored purchaser. Thus, perhaps they hope to compare the "sale" of power from CL&P as a manufacturer to CL&P as a wholesaler with the CL&P sales to them. This they cannot do for an intracorporate transfer does not amount to a sale for purposes of the Clayton Act. *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979); *Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y.1976).

In short, abandoned or not, the Clayton Act claims must be dismissed. This, of course, does not necessarily bar the plaintiffs from raising the so–called price squeeze claim in the context of section 2 of the Sherman Act. *See City of Mishawaka v. American Electrical Power Co., Inc.*, 616 F.2d 976 (7th Cir. 1980).

### 1. Refusal to Wheel Power

A refusal to wheel power would satisfy the conduct element of both plaintiffs' section 1 and section 2 claims.[15] *See Otter Tail, supra.* However, no such refusal to wheel power was shown here.

█ After carefully considering the trial testimony and supporting documents, I conclude that the plaintiffs have not carried their burden of proof with respect to the "wheeling" allegations. The evidence shows that NU repeatedly announced its general willingness to wheel power. During the time in question it entered into numerous wheeling contracts with other public and private utilities. There was no evidence that what the defendants would charge for wheeling power was ever withheld from the plaintiffs when they came to the defendants with a specific request. While the defendants were often unwilling to commit themselves as to what the charge would be until they were supplied details concerning the extent and timing of the requested wheeling, this was a reasonable approach by a company with transmission facilities with limited capacities.

Plaintiffs seek to make much of a 13–month CL&P delay in responding to a request by Wallingford to have 7,000 kilowatts of power wheeled in from Norwich. Wallingford's request for wheeling was dated October 7, 1971, and CL&P's response was not sent until December 8, 1972.

Plaintiffs ask the court to find animus and anticompetitive behavior in the delay. On the contrary, I find the testimony of Mr. Quentin Quinn that he simply misplaced the initial request to be entirely credible. When he was subsequently reminded of the request he promptly responded with a letter setting forth the terms and rates under which wheeling would be made available. This delay was unintentional. It was not exclusionary conduct nor was it conduct in restraint of trade.

### 2. Alleged Anticompetitive Terms in the NEPOOL Agreement

█ While plaintiffs do not challenge the basic concept of pooled resources embodied in the NEPOOL agreement, they do challenge three separate aspects of this particular agreement. First, they claim that the failure to provide for the wheeling of "firm" power is an exclusionary omission which amounts to an unreasonable restraint of trade. I need not tarry long over this claim. It has already been presented for adjudication in three other forums. An Administrative Law Judge, the FPC and the United States Court of Appeals for the District of Columbia have all rejected plaintiffs' arguments.[16] I find those decisions to be persuasive and, for the same reasons as are set forth in their opinions, I conclude that the omission of a term governing the wheeling of firm power was not anticompetitive.[17]

---

**15.** For a description of the other elements which the plaintiffs would need to prove to prevail on these claims, *see* note 14 *supra.*

**16.** New England Power Pool Agreement, F.P.C. Docket No. E–7690 (Nov. 24, 1975) (Decision of C. Wagner, Presiding Administrative Law Judge); New England Power Pool Agreement, F.P.C. Opinion No. 775 (Sept. 10, 1976); *Municipalities of Groton v. Federal Energy Regulatory Commission*, 587 F.2d 1296 (D.C.Cir.1978).

**17.** At an earlier stage in this case it was held that the existence of the FPC (now FERC) with all of its regulatory power over electric power utility companies did not give it prior jurisdiction which required a dismissal of this antitrust case. But even if the plaintiffs are entitled to proceed in a federal judicial forum for vindication of antitrust claims, it does not follow that the facts upon which the antitrust claim is based, which are squarely within the jurisdiction of the Commission to determine, may be relitigated de novo without reference to the Commission's prior rulings. This court accepts the prior findings of the Commission as highly persuasive. *Cf.* Fed.R.Civ.P. 53(e)(2). That Commission, after extensive hearings at which the parties appeared and offered evidence, considered and investigated and thoroughly scrutinized every aspect of the NEPOOL agreement challenged by the municipalities. In this undertaking it was aided by a full staff of employees with special expertise in the field of accounting, cost analysis of power generation and transmission, and every economic factor which could have any effect upon the determination of a fair and reasonable rate to charge for the particular kind of power to be sold, and the relative position of the parties in dealing with each other. The agency's findings of facts

Plaintiffs also challenge the inclusion of two terms. One provision challenged is the so–called 30 percent rule which prohibited any utility company from taking more than 30 percent of its peak capacity from any single unit. The other provision under challenge is the "capability responsibility" term. Under this term, each utility was required to maintain a proscribed level of generating capacity. Should a utility fall below its proscribed level it would be assessed a penalty based on the extent of the shortfall measured as a percentage of the required level of generating capacity.

Plaintiffs have also challenged these provisions in the regulatory process. The FPC, whose decision was affirmed by the United States Court of Appeals for the District of Columbia, ruled for the plaintiffs and required that these provisions be modified because, as written, they discriminated against smaller utility companies.[18] Even assuming, however, that I adopt the FPC's ruling, plaintiffs still do not prevail on this claim for they have not proved that they suffered any injury through operation of these provisions.

The challenged terms were never effective against these plaintiffs for they were never members of NEPOOL. I do not find their claim that these provisions kept them from joining NEPOOL to be credible. These allegedly anticompetitive terms have been stricken from the agreement since September 1976, and none of these plaintiffs have yet made any efforts to become part of NEPOOL. As I noted above, the probable explanation underlying their refusal to join NEPOOL was their desire to maintain a favorable posture for damages in this antitrust suit. Thus, plaintiffs' allegations based on the NEPOOL agreement are without merit.

and conclusions have been submitted in evidence, and I accept its factual findings and conclusions. *See* Fed.R.Civ.P. 53(e).

### 3. *Refusal to Offer a Partial–Requirements Rate*

Plaintiffs allege that CL&P deliberately withheld an offer of a partial–requirements rate in order to insure that the plaintiffs would be faced with an all–or–nothing proposition: either the plaintiffs would receive all of their power from sources other than CL&P or they would have to take it all from CL&P. If the plaintiffs had been able to prove this, they might well have established exclusionary conduct and conduct which constituted an unreasonable restraint of trade. However, the plaintiffs have again failed to carry their burden of persuasion on this question.

The plaintiffs' request for a partial–requirements rate during the pendency of the 1963 contracts was admittedly refused by CL&P. But, as the defendants forcefully argue, the 1963 contracts were total–requirements contracts in which CL&P had contracted to supply all of the power requirements for the municipalities. The municipalities had several opportunities to cancel these contracts but never chose to do so.

With respect to their claims about particular offerings, the plaintiffs' proof is even weaker. They argue that but for CL&P's refusal to provide a partial–requirements rate they would have joined in and reaped the benefits from the Maine and Vermont Yankee Nuclear power plants and from the Northfield Mountain pump–storage plant. Their argument is unsupportable.

On their face, the Maine and Vermont Yankee offers required that utilities interested in participating indicate their *conditional* acceptance of the offer. Then, and only then, would NU be obligated to supply a partial–requirements rate. If the municipalities did not like the partial–requirements rate, they could decline to participate further without penalty for withdrawing.

These plaintiffs never even indicated their conditional acceptance. Thus, under

18. New England Power Pool Agreement, F.P.C. Opinion No. 775 (Sept. 10, 1976) at 23–26; *Municipalities of Groton v. Federal Energy Regulatory Commission*, 587 F.2d 1296 (D.C. Cir.1978).

the terms of the offer, any obligation NU may have had to provide a partial–requirements rate was never triggered. In Massachusetts, where municipal utility systems did indicate their conditional acceptance, they were promptly provided with a partial–requirements rate which many of them found acceptable.

The letter written by Mr. William Clinton on behalf of the municipalities in which he declined these offers never mentioned the need for a partial–requirements rate. In fact, evidence at trial suggested a far more plausible explanation of the municipals' rejection of the offers. At least some of the towns had been advised by their respective counsel that their charters prohibited them from entering into contracts with terms in excess of ten years.

Similarly, notwithstanding the arguments to the contrary, the evidence clearly established that NU offered to provide the municipalities with a partial–requirements rate in order to permit them to participate in the Northfield Mountain project. NU allowed Wallingford (the only municipality that pursued the matter with them) to conditionally accept the entitlement subject to a later right to cancel within 30 days after receiving a partial–requirements rate. Again, notwithstanding the availability of conditional acceptances and partial–requirements rates, none of the municipalities elected to participate in this offering.

Finally, the plaintiffs ask this court to infer that CL&P deliberately withheld the R1 partial–requirements rate in order to minimize the chances that the municipalities had to purchase entitlements in new units. This claim was also unsupported. The R1 rate, which was designed to accommodate the desire of the municipalities to join NEPOOL, was released shortly after the NEPOOL agreement was finalized. Indeed, when the Commission reviewed the rate it concluded that the provisions in it

concerning partial–requirements rates were too "premature," rather than too late. The Connecticut Light and Power Co., F.P.C. Docket No. E–7743 (July 29, 1974) at 24. For the foregoing reasons, the plaintiffs have totally failed to prove that CL&P unreasonably refused to offer partial–requirements rates.

### 4. The Price Squeeze Claims

Before considering the plaintiffs' claims that they were subjected to a "price squeeze," a bit of elucidation of the phrase may be helpful. The claim is that the defendants sold power to industrial customers at rates below those at which they sold to the plaintiffs in an attempt to squeeze the plaintiffs out of competition for industrial business. This claim calls for a shift of focus, for the question with respect to rates is not whether they were reasonable but rather, whether they were discriminatory.[19] See Federal Power Commission v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976).

█ The parameter within which the "price squeeze" was alleged to have had an adverse effect on the plaintiffs is quite limited. Let us examine the situation more closely. They were never "squeezed" in any specific situation. The plaintiffs do not complain that the defendants supplied cheaper electric power to any industrial customers located within the area of the towns which the plaintiffs were authorized to serve. Rather, their contention is that a lower rate to such customers elsewhere may have deterred potential industry from choosing to locate an industrial enterprise within their town's boundaries. While there was some hearsay evidence that electric power rates theoretically might be one of many factors that would be taken into consideration by a business man in making a choice of a location for his industrial

---

**19.** There appears to be a split of authority over whether this court should even consider the merits of the price squeeze claim where both the wholesale and resale prices are completely regulated by government agencies. *Compare City of Mishawaka v. American Electric Power* Co., Inc., 616 F.2d 976 (7th Cir. 1980) *with City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763 (D.Del.1979). In light of the plaintiffs' failure of proof on this claim, however, I need not resolve this question.

operations, its relative importance could not be assessed. And no instance of its ever having been of any real significance in the case of these plaintiffs or any other was shown. The duty is on the plaintiffs to raise their contention of substantial injury from the realm of speculation to the realm of fact. This they have not done.

"The adverse effect upon competition requisite to establish the Section 2(a) [15 U.S.C. § 13(a)] violation with which the [plaintiffs have] here charged [CL&P] is that the price discrimination creates a reasonable probability of substantial injury to competition—such an injury as will with reasonable probability substantially lessen the ability of the unfavored dealers to continue to compete. ... The protection intended to be afforded by the statute is directed to the preservation of competition. The statute's concern with the individual competitor is but incidental."

American Oil Company v. F.T.C., 325 F.2d 101, 104 (7th Cir. 1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964).[20] The sales of power by the defendants to industrial customers outside the plaintiffs' market had no "substantial" anticompetitive effect upon the plaintiffs. Cf. F.P.C. v. Conway Corp., supra.

Plaintiffs have basically alleged two price squeeze claims. First, they have claimed that HELCO's rate to Pratt & Whitney Aircraft (P&W) was intermittently below CL&P's wholesale prices to the municipalities during the 1970's. Defendants dispute the plaintiffs' use of statistics to prove this price differential, but, even leaving that aside, the claimed injury to competition borders on the preposterous. There was absolutely no indication that P&W ever contemplated making the geographic move from East Hartford into one of the plaintiff's service areas nor was there any evidence that a like enterprise ever opted to establish itself in CL&P or HELCO's territory instead of in the plaintiffs' territory. In short, the P&W–municipality disparity in rates, if there ever was one, did not cause the plaintiffs to suffer any injury whatsoever.

Plaintiffs' second–price squeeze claim is based on rate E–35, CL&P's rate to its industrial and commercial customers. Plaintiffs claim that during 1979 the E–35 rate was lower than the R4 rate applicable to the plaintiffs at wholesale. A careful examination of the figures offered by the plaintiffs and those offered in rebuttal by the defendants suggests that when all the relevant factors are taken into consideration, the price to the municipals was not higher than the price to CL&P's industrial customers. In fact, CL&P's price to the municipals was sufficiently below its price to its industrial customers that the municipalities would have been able to resell the power purchased from CL&P at CL&P's industrial rate and still earn a reasonable profit.

Moreover, even if there had been a price differential, the fact that it existed for only a very short time must be considered.[21] As noted by the court in American Oil Company v. F.T.C., supra, at 106:

"[W]e do not mean to imply that a showing of intended permanency of the price discrimination is necessary to establish a Section 2(a) violation. But there must be something more than an essentially temporary minimal impact on competition and probative analysis must reveal a

---

**20.** While American Oil Company v. F.T.C. arose under the Clayton Act as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a), its reasoning is applicable to this Sherman Act claim, 15 U.S.C. § 2, as well. Although 15 U.S.C. § 13(a) deals precisely with the sale of commodities as distinguished from the sale of electric power, see note 14 supra, it fits consistently within Chapter I—Monopolies and Combinations In Restraint of Trade. Thus, insofar as the law proscribing price discrimination that has an anticompetitive effect is concerned, decisions under section 13(a) may be regarded as analogous.

**21.** In July of 1979, CL&P revised its E–35 rate. No evidence concerning the disparity between the R4 rate and the new E–35 rate was ever submitted by the plaintiffs. Thus, their evidence of disparity only goes to the five–month period between February when the R4 rate became effective and July when the E–35 rate was revised.

causal relationship between the price discrimination and an actual or reasonably probable injury to competition in the context of the factual situation involved."

For the foregoing reasons I conclude that no substantial injury to competition occurred as the result of sales of power by defendants to industrial users located outside the geographical boundaries of the plaintiff towns.

## IV.

### Conclusion

Based upon the foregoing findings of fact and conclusions of law, judgment for the defendants on each of the counts in plaintiffs' complaint, together with usual costs, shall be entered.

So ordered.

## V.

### Decision on the Counterclaim

■ At trial, defendants indicated on several occasions that they sought an award of counsel fees expended in connection with the defense of this matter. Such a request is not properly raised by way of a counterclaim and, to the extent that they rely on their counterclaim for that purpose, it is legally insufficient.

■ Nor are defendants entitled to an award of fees under the court's equitable powers. The Clayton Act's allowance of counsel fees in addition to treble damages, 15 U.S.C. § 15, is designed to encourage private litigation. *Cf. Hawaii v. Standard Oil Co.,* 405 U.S. 251, 265–66, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972). There is nothing in that policy which supports an exception to the "American Rule," which does not allow successful defendants to recoup their fees from the plaintiffs. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975).

**22.** Defendants' claims under section 2 of the Sherman Act, 15 U.S.C. § 2, are likewise without merit.

■ While "attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *F. D. Rich Co., Inc. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir. 1980), such is not the case here. The defendants did present a convincing defense to the plaintiffs' claims, several of which had previously been litigated before the Commission. While this may have been duplicative, it was not, however, vexatious or frivolous. The plaintiffs made other claims on which the Commission had not squarely ruled as well. The fact that the defendants were able to settle with some of the original plaintiffs does not mean that these plaintiffs who pursued the lawsuit acted in bad faith, wantonly or for oppressive reasons.

■ Defendants also seek treble damages and attorneys' fees under the Clayton Act for alleged Sherman Act violations by the plaintiffs. They claim that the plaintiffs' joint participation in all of the negotiations and proceedings throughout the torturous history of their interactions was a section 1 conspiracy to boycott, harass and otherwise suppress competition in the electric power industry. While the plaintiffs fought on with indefatigable determination for more favorable rates in what turned out to be a losing case, that does not mean that their conduct was anticompetitive. I hold that it was not. Nor did any of the other evidence introduced at trial suggest that these plaintiffs had been acting in violation of the Sherman Act.[22] Let judgment enter for the plaintiffs on the counterclaim.

So ordered.