662 F.2d 921
 1981-2 Trade Cases 64,329
 CITY OF GROTON, City of Norwich, Borough of Jewett City, Plaintiffs,
Second Taxing District of the City of Norwalk, Third Taxing
District of the City of Norwalk, and the Town of
Wallingford, Connecticut, Plaintiffs-Appellants,
v.
The CONNECTICUT LIGHT & POWER CO., Northeast Utilities,
Inc., the Hartford Electric Light Co. and the
Northeast Utilities Service Co.,
Defendants-Appellees.
 No. 715, Docket 80-7779.
 United States Court of Appeals,
Second Circuit.
 Argued June 8, 1981.
Decided Oct. 13, 1981.
 
 Charles F. Wheatley, Jr., Don Charles Uthus, James Howard, Peter A. Goldsmith, Wheatley & Wollesen, Washington, D. C., John A. Milici, John Ryan, Keene & Milici, Norwalk, Conn., and Robert Regan, Wallingford, Conn., for plaintiffs-appellants.
 Palmer S. McGee, Jr., Albert Zakarion, April Haskell, James G. Green, Jr., Day, Berry & Howard, Hartford, Conn., Dean M. Cordiano, University of Kansas Law School, for defendants-appellees.
 Before OAKES and KEARSE, Circuit Judges, and RE,* Chief Judge, United States Court of International Trade.
 OAKES, Circuit Judge:
 
 
 1
 The State of Connecticut, like many other states, grants exclusive franchise areas to private utilities and to certain municipalities to provide retail electric service to customers within the franchise area. The Town of Wallingford, the Second Taxing District of Norwalk, and the Third Taxing District of Norwalk each have municipal franchises; the first two also have a limited generation capacity which supplements their wholesale purchases of bulk power. Along with certain other municipalities now no longer involved, they brought suit, alleging certain antitrust violations, against the investor-owned private Connecticut utilities, Connecticut Light and Power Company (CL&P) and Hartford Electric Light Co. (HELCO), as well as the Massachusetts holding company, Northeast Utilities, Inc. (NU), that wholly owns the common stock of CL&P and HELCO. The plaintiff municipalities' dealings and transactions were solely with CL&P. After denying the defendants' motion for summary judgment, City of Groton v. Connecticut Light & Power Co., 456 F.Supp. 360 (D.Conn.1978), the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, Judge, held, after a seven-week trial, for the defendants on the merits. City of Groton v. Connecticut Light & Power Co., 497 F.Supp. 1040 (D.Conn.1980). The municipalities appeal.[1]
 
 I. BACKGROUND
 
 2
 Appellants make eight claims on appeal and in order to understand them properly it will be necessary to set forth in some detail the determinations made by the district court below. However, for purposes of brevity we will assume familiarity with the history of the contractual relationships between the municipalities and CL&P, as set forth in Part II of the opinion below, 497 F.Supp. at 1043-47, though we summarize that history here for simplicity.
 
 
 3
 In 1963-64 CL&P and the municipalities entered into agreements (the 1963 agreements) whereby CL&P supplied electricity to the municipalities on the basis of a "demand" charge to recoup fixed costs and an "energy" charge to recover variable costs. The Federal Power Commission (FPC), the predecessor of the Federal Energy Regulatory Commission (FERC), accepted the contracts for filing and review. In 1967 the parties modified the 1963 agreements by adjusting the rates, reducing the notice-of-cancellation clause from three years to one year, clarifying the municipalities' right to install new generating equipment, and establishing a joint advisory and review committee. In 1968 the parties again altered the 1963 contracts, with CL&P agreeing to purchase certain "excess" generating capacity of the municipalities. In late 1969 and early 1970, as the result of complaints by the municipalities about the level and structure of rates, CL&P offered three alternative proposals based on the same demand/energy rate structures contained in the 1963 agreements. Neither these proposals nor the municipalities' counter-proposals were accepted. In the late 1960s and early 1970s the cost of supplying energy began to rise and CL&P began to realize losses in its sale of electricity to the municipalities. CL&P therefore exercised its right to cancel the supply contracts unilaterally; the FPC upheld this cancellation, which became effective in 1972. Meanwhile, the municipalities had declined offers of "entitlements" of power by the Maine Yankee and Vermont Yankee Nuclear Power Corporations and had also declined an opportunity to participate in a pump-storage electrical plant of CL&P at Northfield, Massachusetts.
 
 
 4
 In 1972 CL&P filed a tariff with the FPC known as the R-1 rate which remained in effect until 1974 when it was replaced by a new R-2 rate. The R-1 rate, objected to by the municipalities, used a new type of rate structure which established rates based on "stratified" costs rather than overall average costs. Under the stratified rates, demand costs were based on each generating plant's costs rather than the costs of all CL&P generating equipment divided by the total kilowatts of demand. This change resulted in a lower demand charge for a unit of peak power than for base-intermediate power, 497 F.Supp. at 1047 n.7.
 
 
 5
 The R-1 rate was a total requirements tariff and contained Rider A, which permitted a negotiation of a partial-requirements rate when a wholesale customer such as a municipality began participating in the New England Power Pool (NEPOOL), see note 1 supra, and took entitlements from sources outside of the CL&P system. The municipalities challenged the R-1 rate and its successors, R-2, R-3, and R-4, before the FPC. All these rates contained the same basic concept of stratification to which the municipalities object here, but only the R-1 rate contained Rider A.
 
 
 6
 NEPOOL is an agreement among New England utilities, including some fifty municipalities outside Connecticut, whereby all New England generation is controlled by a central dispatcher without reference to ownership, permitting an "economy interchange" of power among the utilities. Resources are pooled to construct large units capable of economies of scale; members have an entitlement to have energy generated by a pooled plant to be transmitted or "wheeled," without regard to distance, over the transmission lines of other NEPOOL participants; and the utilities systems are interconnected, promoting greater reliability of services so as to avoid major disruptions such as the 1965 power blackout in New York and New England that created the impetus for NEPOOL. The Court of Appeals for the District of Columbia Circuit has approved the NEPOOL agreement, see note 1 supra, upholding the FERC's affirmance of an administrative law judge's determination that the NEPOOL agreement was not contrary to antitrust law and policy except for two discriminatory provisions.
 
 II. THE DISTRICT COURT'S ANALYSIS
 
 7
 The district court divided the claims of anticompetitive behavior into two groups, the first relating to the terms in the 1963 contracts (or their modifications) and the R tariffs, all promulgated pursuant to the Federal Power Act, 16 U.S.C. §§ 791a-825r (1976), and reviewed by the relevant commissions; and the second group consisting of claims of anticompetitive behavior other than the promulgation of rates and conditions of services. This second group consisted of four complaints: "(1) that CL&P refused to wheel power to or from outside sources over its transmission lines, (2) that CL&P joined a NEPOOL agreement containing anticompetitive terms, (3) that (under the 1963 contracts) CL&P delayed in offering a partial-requirements rate which would have permitted the plaintiffs an opportunity to supplement CL&P power with power from other utilities, and (4) that CL&P placed the municipalities in a price squeeze by charging more for its sale of power to the plaintiffs at wholesale than it did for the sale of power at retail to its own industrial customers." 497 F.Supp. at 1049-50.
 
 
 8
 As to the rate and tariff claims, the first group, the court, after noting that the mere existence of a regulatory body does not provide a defendant with immunity from all antitrust liability, Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), held that because the contract rates and tariffs challenged were filed with the appropriate federal regulatory commission and were the legal rates, the municipalities, like the carrier in Keogh v. Chicago & Northwestern Railway, 260 U.S. 156, 162-63, 43 S.Ct. 47, 49-50, 67 L.Ed. 183 (1922), were not injured and hence had no right of action under the Sherman Act, 15 U.S.C. §§ 1-7 (1976). See Gas Light Co. of Columbus v. Georgia Power Co., 440 F.2d 1135, 1137-40 (5th Cir. 1971), cert. denied, 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972).
 
 
 9
 The district court went on to hold that even if the Keogh doctrine did not apply, the municipalities had not proved any antitrust violation with respect to the terms of the 1963 contracts and R tariffs, for they "were not so devoid of reasonableness as to justify the inference that they were intended to enhance CL&P's alleged monopoly power. City of Mishawaka v. American Electric Power Co., Inc., 616 F.2d 976, 985 (7th Cir. 1980) (, cert. denied, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981))." 497 F.Supp. at 1051. The court also found that there was no evidence of any intent on the part of the defendants to monopolize, noting in dictum that specific intent has been required when the defendant is a regulated utility that is entitled to recover its costs of service and provide investors with a reasonable rate of return, id. at 1051 n.13 (citing City of Mishawaka, 616 F.2d at 985, and Almeda Mall, Inc. v. Houston Lighting & Power Co., 615 F.2d 343, 354 (5th Cir. 1980) ("Monopolization cases involving such regulated industries are special in nature and require close scrutiny")). The court also found that the rates did not involve unreasonable restraints of trade under section 1 of the Sherman Act or amount to conduct in violation of section 2 of the Act.
 
 
 10
 The district court discussed each of the claims not relating to rates individually as follows:
 
 
 11
 A. Refusal to Wheel.
 
 
 12
 While a refusal to wheel power would satisfy the conduct element under both sections 1 and 2 of the Sherman Act, see Otter Tail Power Co., the plaintiffs showed no such refusal to wheel. Rather, the district court held, "NU repeatedly announced its general willingness to wheel power" even though the defendant utilities "were often unwilling to commit themselves as to what the charge would be until they were supplied details concerning the extent and timing of the requested wheeling." 497 F.Supp. at 1053. The court found this a reasonable approach in view of the limited capacity of the transmission facilities and further held that a thirteen-month CL&P delay in responding to a request by Wallingford to have 7,000 kilowatts of power wheeled from Norwich was an unintentional office mishap, not an exclusionary action in restraint of trade.
 
 
 13
 B. NEPOOL Agreement.
 
 
 14
 As to the NEPOOL Agreement's omission of a term governing the wheeling of firm power, the district court found persuasive the prior rejection of the plaintiffs' arguments by an ALJ, the FPC, and the Court of Appeals for the District of Columbia Circuit, see note 1 supra, and concluded that the omission was not anticompetitive. It also found that the thirty-percent rule prohibiting any utility company from taking more than thirty percent of its peak capacity from any single unit, along with the "capability responsibility" provision whereby each utility would be penalized for falling below its prescribed level of generating capacity, had not caused the plaintiffs any injury, (a) because plaintiffs were never members of NEPOOL and (b) because the claim that these provisions kept them from joining NEPOOL was not credible since these provisions were stricken from the NEPOOL agreement in September 1976 yet none of the plaintiffs thereafter made any effort to join NEPOOL (apparently on advice of counsel in the antitrust suit).
 
 
 15
 C. Refusal to Offer a Partial-Requirements Rate.
 
 
 16
 The court held that the plaintiffs failed to prove that CL&P deliberately withheld an offer of a partial-requirements rate to ensure that the municipalities would be forced to take all their power from sources other than CL&P or all of it from CL&P. More specifically, although CL&P refused the municipalities' request for a partial-requirements rate under the 1963 agreements, those were total-requirements contracts in which CL&P had contracted to supply all of the municipalities' power requirements. With respect to the Maine and Vermont Yankee Nuclear Power plants and the Northfield Mountain Pump-Storage plant, none of the municipalities indicated even a conditional acceptance of the offers to join, so that any obligations NU may have had to provide a partial-requirements rate were never triggered. According to the court, 497 F.Supp. at 1055, Massachusetts municipalities that did conditionally accept were promptly provided with a partial-requirements rate that many found acceptable. Moreover, some of the municipalities were advised by counsel that their charters prohibited them from entering into contracts with terms in excess of ten years, such as these ventures called for. Finally, as to the R-1 partial-requirements rate, the court noted that CL&P had not withheld it for too long, as the plaintiffs claimed; rather, it was released shortly after the NEPOOL agreement was finalized and was considered by the FPC to be "premature." Id.
 
 
 17
 D. "Price Squeeze" Claims.
 
 
 18
 The district court viewed the claim "that the defendants sold power to industrial customers at rates below those at which they sold to the plaintiffs in an attempt to squeeze the plaintiffs out of competition for industrial business," id., as a claim of discrimination that boiled down to an assertion that potential industries were thereby deterred from locating their industrial enterprises within the boundaries of the municipalities. Evidence about the effect of electric rates on an enterprise's choice of location was most abstract, however, and was not shown to be of real significance in any specific case. The sales of power by CL&P to industrial customers outside the municipalities' market were held to have no "substantial" anticompetitive effect, see American Oil Co. v. FTC, 325 F.2d 101, 104 (7th Cir. 1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964). The first specific claim, that HELCO's rate to Pratt & Whitney Aircraft was intermittently below CL&P's wholesale price to the municipalities, was found to be insignificant because there was no indication that Pratt & Whitney ever contemplated moving from East Hartford into one of the municipalities's service areas or that a like enterprise ever opted to establish itself in CL&P or HELCO territory instead of in one of the municipalities. Analyzing the second price-squeeze claim, the court noted that when all relevant factors were considered the rate applicable to the municipalities was not higher than the rate to CL&P's industrial customers, but that even if it were higher it was for such a short time as to have a temporary minimal impact on competition, see American Oil Co. v. FTC, 325 F.2d at 106.
 
 III. APPELLANT'S ARGUMENTS
 
 19
 On appeal the municipal utilities argue that under City of Mishawaka v. American Electric Power Co., 616 F.2d 976 (7th Cir. 1980), cert. denied, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), the court should have examined all the issues together, rather than separated the tariff and rate issues from the other four claims. They contend that since the R-1 rate made it uneconomic for them to obtain alternate sources of power, the rates issue affects all of the other issues such as the NEPOOL and wheeling claims. In other words, "(i) t is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor," City of Mishawaka, 616 F.2d at 986. The municipalities urge that the Keogh doctrine is inapplicable because through economic penalties and predatory terms they have been prevented from acquiring alternate sources of power; moreover, the Commission has never approved the rates but on the contrary has in certain respects rejected them under the Federal Power Act in its final R-1 decision (Apr. 28, 1976) and its recent R-3 decision (Nov. 21, 1980). Despite these decisions, the argument runs, the defendants have continued to impose these restrictive terms and conditions through successive rate filings and regulatory lag, cf. City of Mishawaka, 616 F.2d at 982 (each successive utility wholesale tariff the utility filed was reduced by the Commission; meanwhile, the municipalities were living with unregulated wholesale rates). See also Note, The Applicability of Antitrust Laws to Price Squeezes in the Electric Utility Industry, 54 St. John's L.Rev. 103, 106-10 (1979). The municipalities assert that the Keogh rule cannot bar a challenge to unapproved rates, see Essential Communications Systems, Inc. v. American Telephone & Telegraph Co., 487 F.Supp. 942, 951 (S.D.N.Y.1980). Keogh is distinguished, as is Essential Communications Systems, Inc., as involving an antitrust suit against the rate-regulated utility by a customer rather than a competitor; this distinction carries with it the proposition that, despite Connecticut's imposition of exclusive franchise areas, a wholesale customer and the filing utility are in competition at least with respect to new customers who may choose to locate in the relevant geographical area. See Connecticut Light & Power Co., 31 Pub.U.Rep. 4th 315, 321 (FERC Aug. 20, 1979).
 
 
 20
 Additionally, the municipalities contend that the lower court erred in requiring proof of specific intent, in making any inferences of intent from CL& P's filings with the Commission, and in not making specific findings and conclusions on the matter. The appellants also assert that the district court erred in considering a "legitimate business purpose" to be a defense to anticompetitive acts and in not making any findings on the matter. They claim that CL&P's horizontal market divisions are per se violations of the Sherman Act in that the 1963 contracts and the R rates explicitly restricted the area in which the cities could resell electricity, and the restraints on new generation in the amendments to the 1963 contract and in the R rates were a form of territorial limitation. In addition, CL&P's refusal under the 1963 agreements to provide the municipalities with a partial-requirements rate is alleged to have unreasonably restricted access to outside sources of supply. The municipalities argue that the district court further erred in not determining whether the exclusion of firm-power wheeling from the NEPOOL agreement violated the antitrust laws and in denying relief for the thirty-percent rule and the capacity-responsibility penalty of NEPOOL, which the FPC, affirmed in Municipalities of Groton v. FERC, see note 1 supra, expressly found discriminatory against small systems. The district court's rulings that there was no refusal to wheel and that a "specific request" to wheel was a prerequisite to finding an antitrust violation were erroneous as a matter of law, the municipalities contend, citing Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 487, 88 S.Ct. 2224, 2228, 20 L.Ed.2d 1231 (1968), and Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410-11, 8 L.Ed.2d 777 (1962). They allege that by refusing to include a wheeling provision in its rates, and by denying a broad request for a general commitment to wheel, CL&P prevented the municipalities from seeking power elsewhere. Finally, the appellants argue that the court below improperly analyzed their price-squeeze claims. They insist that under the R-4 rate, wholesale rates were not below the rates charged large retail services, resulting in a squeeze lasting for more than five months and the loss of more than one million dollars, and that the rates charged by defendant HELCO to Pratt & Whitney placed the municipalities in a price squeeze regardless of whether Pratt & Whitney ever actually considered relocating its operation.
 
 
 21
 We consider each of appellants' arguments below.
 
 IV. DISCUSSION
 
 22
 A. Examination of the Issues Cumulatively.
 
 
 23
 Generally we agree with the dictum in City of Mishawaka that "(i)t is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor," 616 F.2d at 986. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. at 699, 82 S.Ct. at 1410 (Sherman Act plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"). Even though many of the issues the municipalities raise are interrelated and interdependent, however, we must, like the municipalities' briefs, analyze the various issues individually. Moreover, we reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act. The proper inquiry is whether, qualitatively, there is a "synergistic effect." Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76 at 95 n.28 (2d Cir. 1981).
 
 
 24
 B. The Effect of Regulatory Review and the Applicability of
 
 
 25
 the Keogh Doctrine.
 
 
 26
 Under the Keogh or "filed rate" doctrine, which the court below relied on in part in analyzing the claims based on rates and conditions of services, a public utility subject to regulation is not subject to antitrust liability to its customers for rates or services provided under tariffs approved by the appropriate regulatory agency. The rationale is that the regulatory agency determines the legal rate and the utility must collect it while it is in effect. Keogh v. Chicago & Northwestern Railway, 260 U.S. at 162, 43 S.Ct. at 49. The doctrine applies to rates that have been published but not acted upon by the regulatory agency, because they are the legal rates until suspended or set aside. Id. at 163, 43 S.Ct. at 50. Otherwise unjust discrimination might occur because the customer of the utility who recovers an antitrust judgment would receive a preference over his competitors who are other customers. Id.
 
 
 27
 At the same time, as the district court noted, supervision by a regulatory body does not provide immunity against all antitrust claims. 497 F.Supp. at 1050. Disapproved tariffs provide no immunity when, as here, the regulatory agency expressly refuses to commit itself pending investigation. Northeastern Telephone Co. v. American Telephone & Telegraph Co. at 83-84. A utility that refuses to wholesale power to municipal systems or wheel it from other sources may be ordered to wheel in a Sherman Act suit. Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). Likewise, if a utility that competes with a wholesale customer engages in a price squeeze by charging the wholesale customer more than its retail customers, the filed-rate doctrine may not be applicable. City of Mishawaka v. Indiana & Michigan Electric Co., 560 F.2d 1314 (7th Cir. 1977), cert. denied, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978), but see City of Newark v. Delmarva Power & Light Co., 467 F.Supp. 763, 770-71 (D.Del.1979) (disallowing antitrust remedy for price squeeze by electric utility); McLeran v. El Paso Natural Gas Co., 357 F.Supp. 329 (S.D.Tex.1972) (no antitrust jurisdiction over natural gas rates regulated by the FPC), aff'd without opinion, 491 F.2d 1405 (5th Cir. 1974). And the fact that a tariff permits a utility to supply its residential customers with free light bulbs does not immunize the utility from suit under the federal antitrust laws by competitor light-bulb sellers, Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Parker v. Brown exemption inapplicable).[2]
 
 
 28
 In sum, an anticompetitive practice embodied in a tariff may violate the antitrust laws if it (a) impacts upon competitors as opposed to customers or (b) has been disapproved by the regulatory agency that is the "first line of defense against ... anticompetitive practices," see, e. g., Gulf States Utilities Co. v. FPC, 411 U.S. 747, 760, 93 S.Ct. 1870, 1878, 36 L.Ed.2d 635 (1973) (citing Meeks, Concentration in the Electric Power Industry: The Impact of Antitrust Policy, 72 Colum.L.Rev. 64 (1972)) (the EPC must scrutinize a bond issue for anticompetitive effect). Although we find the district court's reliance upon the Keogh doctrine to be inappropriate, both because the municipalities were competitors as well as customers of CL&P and because the Commission disapproved several of the R-rate provisions at issue here, we accept the lower court's finding that the rates were not motivated by anticompetitive intent. We now turn to each of these points.
 
 
 29
 The district court expressly found that the municipalities were not in competition with CL&P. Though the court made this finding only in reference to the price-squeeze claims, 497 F.Supp. at 1055-56, its opinion clearly indicates that it thought the municipalities were purchasing power solely as customers, not as competitors. It is inherently difficult to define competition in the electric-power industry; the best definition, we believe, at least for purposes of this case, is one by the Federal Energy Regulatory Commission. In Connecticut Light & Power Co., 31 Pub.U.Rep. 4th 315, 320-22 (Aug. 20, 1979), the Commission obtained guidance from two cases. The first, United States v. El Paso Natural Gas Co., 376 U.S. 651, 659-61, 84 S.Ct. 1044, 1048-49, 12 L.Ed.2d 12 (1964), states:
 
 
 30
 This is not a field where merchants are in a continuous daily struggle to hold old customers and to win new ones over from their rivals .... the competition then is for the new increments of demand that may emerge with an expanding population and with an expanding industrial or household use of gas.... The presence of two or more suppliers gives buyers a choice.
 
 
 31
 (Emphasis omitted.) The second case, Borough of Ellwood City v. Pennsylvania Power Co., 462 F.Supp. 1343, 1346 (W.D.Pa.1979) states:
 
 
 32
 For practical purposes, competition between Penn Power and plaintiffs can be seen most strongly in the service of industrial and commercial customers having the option to locate in either the service area of Penn Power or that of plaintiffs. These customers do have a choice of suppliers when making their initial decision to locate their operations.... Plaintiffs and Penn Power also compete, at least theoretically and on a long term basis, for service areas. If plaintiffs were to become unable to serve their customers profitably, Penn Power would logically be in the best position to assume plaintiffs' present service.
 
 
 33
 The Commission thus viewed the essential characteristic of competition in the electric-power industry as being "that there are or could be alternate suppliers of the same product in the same geographic area," 31 Pub.U.Rep. 4th at 321, and further held as to the utilities involved here that "it is sufficient if it is demonstrated that a wholesale customer and the filing utility are in geographic proximity and that the wholesale customer is or could be an alternative supplier of electricity to some of the customers presently served by the company or that the company could be an alternate supplier for customers presently served by the wholesale customer." Id. The Commission also noted that the utility and the wholesale customer "could be alternate suppliers to new customers who may choose to locate in the relevant geographic area." Id. The Commission divided competition into three categories: competition for individual customers, including large industrial or commercial loads; franchise competition, for the right to serve all of the customers in a given territory, usually for a specific period of time (see Otter Tail Power Co.,); and fringe area competition, for customers on the fringes of the present service areas of the rival utilities. See Conway Corp. v. FPC, 510 F.2d 1264, 1268 (D.C.Cir.1975), aff'd, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976); Meeks, supra, at 81-100. It is true that the Commission's decision that these parties were competitors was solely a determination that there was a prima facie case of a "price squeeze," whereas the district judge has, after hearing all the evidence, made findings concerning the absence of competition. Nevertheless, under the Commission's definition of competition, which we find persuasive both on its face and in the light of the Commission's expertise with respect to the electric industry, and which we here adopt, the district court's general findings of no competition cannot stand. CL&P is not immune under Keogh to the extent that the rate claims involve either customer competition or franchise competition.
 
 
 34
 Moreover, the FPC rejected or disapproved some of the rates and ordered the utilities to make refunds to the municipalities. Other proceedings are pending. While the Keogh doctrine may cover filed rates that have not yet been approved, it does not immunize rates that have ultimately been disapproved. See Northeastern Telephone Co. v. American Telephone & Telegraph Co.; Litton Systems, Inc. v. American Telephone & Telegraph Co., 487 F.Supp. at 951 (quoting Essential Communications Systems, 610 F.2d at 1124). The rejected portions of the R rates include a proposed twelve-month 100 percent demand ratchet[3] (for which the Commission on rehearing substituted an eleven-month 80 percent demand ratchet) and the use of the novel "stratified" rate design which the Commission found to be a concept "worthy in the abstract" but "defective" in that it was based on NU's systemwide data and costs rather than CL&P's, in that hours-use levels were based on annual rather than monthly system peaks, and in that the costing was inconsistent with CL&P's basis cost of service allocation premised on an integrated system. Connecticut Light & Power Co., Dkt. No. E-7743 at 14-15 (FPC Apr. 28, 1976).
 
 
 35
 As the district court clearly recognized, however, a finding that Keogh is inapplicable either because the litigants are competitors or because the filed rates are disapproved does not end the analysis. At least as to the terms of the 1963 contracts and R tariffs, the district court specifically held that there was no proof of an antitrust violation; the challenged provisions of the rates were "not so devoid of reasonableness as to justify the inference that they were intended to enhance CL&P's alleged monopoly powers." 497 F.Supp. at 1051. We do not believe that this finding was clearly erroneous, even though we would prefer it to have been more specific. Some sort of demand ratchet was reasonable and indeed was proffered by the municipal utilities and accepted by the Commission. See Connecticut Light & Power Co., Dkt. No. E-7743 at 9 (FPC opinion and order on rehearing, July 20, 1977). The novel stratified-rate concept was sound in the abstract even if impracticable in the concrete. The evidence presented to the district court differed from that in City of Mishawaka v. American Electric Power Co., in which the district court found that the defendants specifically intended "predatory" practices "including in general ... threats to the municipal wholesale power supplies, and the utility policy of acquisition of municipal systems." 616 F.2d at 984-85. Here we have no such practices and we do have a specific determination by the district court that there is no reason to infer an intent to monopolize from "any of the other evidence in the case." 497 F.Supp. at 1051. We agree with City of Mishawaka, 616 F.2d at 985, that in the case of a regulated utility entitled to recover its cost of service and to provide its investors with a reasonable rate of return, "something more than general intent should be required to establish a Sherman Act violation." See also Almeda Mall, Inc. v. Houston Lighting & Power Co., 615 F.2d 343, 354 (5th Cir. 1980). But even if general intent to monopolize were sufficient, as in e. g., United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948), the court's basic finding was that there was no general intent; its reference to Mishawaka and Almeda Mall was dictum in a footnote, 497 F.Supp. at 1051 n.13. True, the district court drew a favorable inference from CL&P's filing of rates with the Commission, indicating that submission of a rate for Commission scrutiny as to reasonableness "goes a long way" toward negating any inference that the utility's purpose was to drive the municipalities out of business (citing Almeda Mall ). 497 F.Supp. at 1051. We agree with the municipalities that mere filing should not permit any such inference if the tariffs reveal an intent to monopolize. See MCI Communications Corp. v. American Telephone & Telegraph Co., 462 F.Supp. 1072, 1098 (N.D.Ill.1978), appeal docketed Nos. 80-2171, 80-2288 (7th Cir. Aug. 27, 1980). No such intent is revealed in the tariffs filed by CL&P, however; the district court in connection with intent found the "legitimate business justifications ... offered to explain (CL& P's) actions ... entirely credible." 497 F.Supp. at 1051. Though the district court did not deal specifically in its opinion with the restrictions on self-generation or the allegedly predatory provisions of the 1963 contracts and the R-1 rate, its findings that the municipalities were "fairly satisfied" with the 1963 contracts and the 1967 modification, 497 F.Supp. at 1044, and that the 1963 contracts as amended turned out to be so favorable to the municipalities that it was CL&P that eventually canceled them, id. at 1045-46, and its findings about the R rates and particularly the stratified-rate device, id. at 1046-47, all may be taken into account in sustaining the district court's general finding of no anticompetitive intent, subject only to the provision that we must, as indicated at the outset, view the case as a whole even as we discuss its component issues separately.
 
 
 36
 The municipalities also object to the R tariffs' imposition of territorial restrictions on resale. But the R rates did not and do not preclude resale by the municipalities of power to other utilities. Rather they preclude resale to other utilities at the rates provided for in the R tariffs. Although we are handicapped by an absence of findings on this matter, it appears that power purchased from CL&P by the municipalities and sold to other utilities would be additional power produced from fossil-fuel-generated plants rather than regularly furnished power which includes a substantial portion of less expensive nuclear-produced power. The FERC recognized this, ruling in Connecticut Light & Power, Dkt. No. E-7743 at 18-19 (FPC Apr. 28, 1976), that the purpose of the restriction was not to restrain trade but to prevent the municipalities from causing CL&P to supply a substantial portion of the capacity needs of another distributor or in effect to take redelivery of the power; the Commission found the restrictions "appropriate" and not in violation either of the Federal Power Act or of section 1 of the Sherman Act. This finding is not binding, of course, but is noteworthy.
 
 
 37
 C. The Municipalities' Other Complaints.
 
 
 38
 1. Refusal to Wheel Power. An unreasonable refusal to wheel power would clearly violate both section 1 and section 2 of the Sherman Act. See Otter Tail. The district court specifically found, however, that the municipalities had not proved that CL&P refused to wheel. The municipalities challenge this determination, arguing that stripped of irrelevancies the finding of the court below involves two interrelated and erroneous theories: (1) that CL&P never refused to wheel pursuant to a specific request by the municipalities and (2) that CL&P's refusal of general requests to wheel was reasonable. With respect to the second point, we agree with the district court as a matter of law. Appellees are not required by law to include a wheeling provision in their rates. CL&P's transmission facilities are limited and the charge for wheeling would thus depend on the extent and timing of the request. The appellees and the municipalities are aware that an unreasonable refusal to wheel is improper under Otter Tail ; NU repeatedly announced its willingness to wheel and entered into numerous wheeling contracts.
 
 
 39
 The municipalities dispute the court's finding, based on the testimony of a CL&P witness, that a delay in answering one specific request by Wallingford to wheel 7,000 kilowatts of power from Norwich was inadvertent and unintentional. They point to a letter explaining the thirteen-month delay as a result of "all of the necessary data ... not (being) available at the time." Regardless of the credibility of the evidence of inadvertence, however (which was for the district court to decide), there is no evidence in the record that Wallingford was concerned about this delay or pressed for a response.
 
 
 40
 In short, a general agreement to wheel without reference to time, quantity of power, or transmission capacity is essentially meaningless. We are thus confined to the one specific request for wheeling 7,000 kilowatts from Norwich to Wallingford for peaking purposes. CL&P answered this request favorably, but the municipalities object that the agreement to wheel was conditioned upon Wallingford taking the power under Rider A of the R-1 rate. This rider, as we have mentioned, was omitted from subsequent R rates. The municipalities argue that under Rider A Wallingford would have been required to designate its entire power requirements from CL&P for seven years in advance in order to receive wheeled power, a condition rejected by the FPC in its April 1976 decision as unreasonable (holding that one year was reasonable). While we see the strength of the municipalities' position on this point, the fact remains that the appellees introduced substantial evidence given weight by the district court that on numerous occasions CL&P and NU agreed to wheel power generated by other utilities on basically the same terms and conditions. The Rider A problem was not followed up by Wallingford at the time and seems an afterthought here. We find no error in this respect.
 
 
 41
 2. Alleged Anticompetitive Terms in the NEPOOL Agreement. We affirm as to this claim on the opinion below, 497 F.Supp. at 1053-54, based upon the findings of fact made therein as well as in id. at 1047-49. See also note 1 supra. The district judge noted that as nonmembers of NEPOOL the municipalities could not have been injured by section 9.4(d) and section 9.5 of the NEPOOL Agreement which the Commission respectively modified and eliminated as discriminatory against smaller utility companies. Judge Blumenfeld also found that the NEPOOL Agreement's lack of a provision for the wheeling of firm power was not anticompetitive, as had the Commission and the Court of Appeals for the District of Columbia Circuit, see note 1 supra, whose opinions he found persuasive. We find no error on these points.
 
 
 42
 3. Refusal to Offer a Partial-Requirements Rate. From the time of the 1963 contracts until the effective date of the R-1 rate, January 15, 1973, CL&P made no partial-requirements rate available to the municipalities. As the court below found, however, the 1963 contracts were total-requirements contracts in which CL&P agreed to supply all of the municipalities' power requirements. According to the municipalities, their only option in the absence of a partial-requirements rate was to take all power from a source other than CL&P, the very "all-or-nothing proposition" that the lower court stated might have established exclusionary conduct constituting an unreasonable restraint of trade. 497 F.Supp. at 1054. We agree with the municipalities that their signing of the 1963 contracts did not immunize CL&P from the antitrust laws, see Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), but the municipalities also never canceled these contracts; indeed they became so favorable to the municipalities that ultimately CL&P canceled them. Despite the municipalities' argument now that these were not "all requirements" contracts because CL&P expressly limited the amount of increased capacity that it would provide, as we read the evidence below CL&P did undertake the obligation to supply all the requirements of the municipalities exclusive of that supplied by their own generating capacity. We agree with district court's characterization of the contracts rather than the municipalities' description. The provisions of paragraph four of the contract between Norwich and CL&P dated April 6, 1964, for example, is self-explanatory,[4] the amount of increased capacity CL&P would provide, rather than being "expressly limited" as appellants argue on page 9 of their brief, is expressly unlimited. The second sentence of the paragraph merely gives CL&P some leeway in responding to capacity increases required at any one time in excess of a specified bloc of kilowatts.
 
 
 43
 4. The Price-Squeeze Claims. The municipalities made two price-squeeze claims-claims that CL&P's rates to its retail customers were lower than the wholesale charges to the municipalities. See generally Note, The Applicability of Antitrust Laws To Price Squeezes in the Electric Utility Industry, 54 St. John's L.Rev. 103 (1979). First, the municipalities contended that for a five-month period the E-35 rate for large retail service was lower than the R-4 wholesale rate, see City of Mishawaka; Minnesota Power and Light Co., Op.No. 87, 11 FERC P 61,313 at 61,661 (1980) (seven months). The district court found, however, that taking all relevant factors into consideration the price to the municipalities was not higher than the price to the industrial customers; furthermore, relying on American Oil Co. v. FTC, the court held that even if there had been a price differential, its short duration minimized the possibility of injury.
 
 
 44
 We believe that a five-month period is long enough to support a price-squeeze claim if the sums involved are substantial, and testimony in the record indicates that the amount at issue here is more than one million dollars. We are unable, however, to review the district court's finding that "when all the relevant factors are taken into consideration," the wholesale price was not higher, 497 F.Supp. at 1056, because the court does not describe those "relevant factors." We therefore must remand for further findings on this point.
 
 
 45
 The municipalities' second claim was that HELCO's rate to Pratt & Whitney Aircraft was intermittently below CL&P's wholesale rate to the municipalities during the 1970s. The court did not decide whether there was actually a price differential because it took a narrow view of what constitutes competition: it held that because there was no indication that Pratt & Whitney contemplated moving, and no evidence that a like enterprise ever chose to locate in CL&P or HELCO territory instead of in one of the municipalities, the municipalities had sustained no injury. Our definition of competition in the electric-power industry as set forth in part IVB supra, which is also the view of the District of Columbia Circuit and the FERC, is broader and includes competition for individual customers. Franchise competition, and fringe-area competition. See Connecticut Light & Power Co., 31 Pub.U.Rep. 4th at 320-22; Conway Corp. v. FPC, 510 F.2d at 1268; Meeks, supra, at 81-100. Under our definition of competition the subjective plans of individual customers are irrelevant. Competition exists if the monopoly utility and the municipalities are in geographic proximity and are generally each seeking to have retail businesses locate within their respective franchise areas. In a case where, as here, such competition exists, and where in addition there is a discrepancy between the retail and wholesale rates, a rebuttable presumption arises that the differential has an anticompetitive effect, and the burden is on the monopoly utility to provide evidence that there is no reasonable probability that the differential will have an effect upon the location of such potential customers. The district court's narrow definition of competition in the electric-power industry may have led it, perhaps erroneously, to place on the municipalities the burden of producing evidence as to anti-competitive effect. We must, therefore, remand for further findings, with the additional caution that if either party offers further evidence within reasonable limits the court should take it. We express no view on whether there was indeed a price differential; that is a matter the district court may find it appropriate to discuss on the remand.
 
 
 46
 D. Consideration of the Claims as a Whole.
 
 
 47
 Viewing the municipalities' claims and proof as a whole as Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. at 699, and City of Mishawaka, 616 F.2d at 986, require, we fail to find any indication that, even if the price-squeeze claims are valid, the overall "synergistic effect" of the rates, acts, and practices of the appellees gives rise to violations of either section 1 or section 2 of the Sherman Act. See Northeastern Telephone Co. v. American Telephone & Telegraph Co., slip op. at 95 n.28. The municipalities demonstrated no long-term wholesale and retail rate disparity, no threats of discontinuing the municipalities' wholesale power supplies, and no continuing policy of acquiring municipal systems. In these respects the instant case differs significantly from City of Mishawaka. See 616 F.2d at 984-85. There was in short, as Judge Blumenfeld found, no general intent to impede the municipalities' competitive position or to enhance the defendants-appellees' alleged monopoly power, and there was no anticompetitive or exclusionary conduct except, possibly, for two specific price-squeezes about which we have remanded. See generally Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 275 (2d Cir. 1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); Northeastern Telephone Co. v. American Telephone & Telegraph Co., slip op. at 84-86.
 
 V. CONCLUSION
 
 48
 We affirm the judgment below except with respect to the two price-squeeze claims, as to which we remand for further findings.
 
 
 49
 Judgment in accordance with opinion.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 In a related action, Municipalities of Groton v. Federal Energy Regulatory Comm'n, 587 F.2d 1296 (D.C.Cir.1978), petitions for review of FERC orders relating to the New England Power Pool (NEPOOL) were brought by nine municipalities of Connecticut and Massachusetts, as well as by the NEPOOL executive committee. The court upheld the FERC's determination that the NEPOOL agreement, which effects a comprehensive interconnection and coordination among numerous New England utilities, was proper except for sections 9.4(d) and 9.5 thereof, which were discriminatory. The FERC had ordered that section 9.4(d) be modified and that section 9.5 be eliminated. Some of the antitrust claims made by the municipalities here relate to the NEPOOL agreement
 
 
 [2]
 Although CL&P disclaims reliance on the doctrine of immunity under the antitrust laws for state action set forth in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the district court, 497 F.Supp. at 1050-51 n.11, did to some extent rely upon Gas Light Co. of Columbus v. Georgia Power Co., 440 F.2d 1135 (5th Cir. 1971), cert. denied, 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972), which in turn relied on Parker v. Brown
 
 
 [3]
 In determining the power purchaser's system and billing demands on which the R-1 rates were partially based, the demands were calculated for any given month at the maximum clock hours kilowatt demand (a) experienced by the buyer in meeting its system requirements from all sources available to the buyer in the 12-month period ending on the last day of the current month (system demand), or (b) supplied by CL&P to the buyer in such period (billing demand). In the FPC proceedings the municipalities protested to the ALJ that they would be unable to purchase power economically from other sources or to add to their own generating facilities, and further that in establishing the system demand the 12-month period was inappropriate because a different rate was in effect in which the level of service was higher than it would be under the proposed rates. The ALJ held that the ratchet provision should be eliminated but permitted CL&P to "file a new provision to provide for potential outages of generating units owned and dispatched by the generating municipalities...." Connecticut Light & Power Co., Dkt. No. E-7743 at 17 (FPC July 29, 1974). The Commission noted the additional argument of the municipalities that because billing demand included self-generation, the ratchet would cause that to be included in the billing demand calculations, as would be the case under a system-demand basis. The FPC also noted that while the ratchet was based on the highest single demand of a resale customer during a 12-month period, power supply costs were related to actual monthly demands of a resale customer. Connecticut Light & Power, Dkt. No. E-7743 at 11 (FPC Apr. 28, 1976). As noted in the text, however, on rehearing the Commission permitted a modified demand ratchet, which the municipalities had in fact proposed
 
 
 [4]
 Paragraph four provides:
 The Power Company shall supply the City, hereunder, its requirements as they may be from time to time. If the City requires a capacity increase at any one time in excess of 2,500 kilowatts, written application shall be made to the Power Company for the amount of increased capacity required, and the Power Company shall have a reasonable length of time to obtain and install all necessary equipment and it shall not be held liable for any reasonable delay in obtaining such necessary equipment or in supplying such increased capacity.